44 A.3d 970

**Jessica PORT**

v.

**Virginia Anne COWAN.**

**No. 69, Sept. Term, 2011.**

Court of Appeals of Maryland.

May 18, 2012.

436

Shannon Minter (National Center for Lesbian Rights of San Francisco, California; Michele Zavos of Zavos Juncker Law Group, PLLC, Silver Spring, MD), on brief, for appellant/cross-appellee.

Susan Sommer (Lambda Legal Defense and Education Fund, Inc., New York, New York), on brief, for appellee/cross-appellant.

Leslie R. Stellman (Mark Scurti of Hodes, Pessin and Katz, P.A., Towson, MD), on brief, for appellee/cross-appellant.

Alan E. Schoenfeld, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, A. Stephen Hut, Jr., Esq., Paul R.Q. Wolfson, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, for amici curiae brief of Equality Maryland, Inc., Rainbow Families, and American Civil Liberties Union of Maryland.

Rachael A. Harris, Esq., Squire, Sanders & Dempsey (US) LLP, Washington, DC, Robert J. Guite, Esq., Amy E. Rose, Esq., Julie E. Schwartz, Esq., Squire, Sanders & Dempsey (US), LLP, San Francisco, CA, Motion of the Deans and Faculty of the University of Baltimore School of Law and the University of Maryland School of Law for Leave to Participate as Amicus Curiae and Brief of Amici Curiae.

Margaret E. Lancaster, Esq., Law Offices of Margaret E. Lancaster, Hyattsville, MD, Motion for Leave to Participate as Amicus Curiae and Brief of Amici Curiae on Behalf of the Maryland Black Family Alliance and the National Black Justice Coalition.

**438**

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and IRMA S. RAKER (Retired, Specially Assigned), JJ.

HARRELL, J.

Appellant, Jessica Port, and Appellee, Virginia Anne Cowan, married in California in 2008. Approximately two years later, Port and Cowan agreed mutually to separate. Port filed ultimately a divorce complaint, on the ground of voluntary separation, in the Circuit Court for Prince George's County (at the time, she was a resident of the County). Cowan answered the complaint in a "no contest" manner. The court denied the requested relief, explaining in its written order that the marriage was "not valid" and "contrary to the public policy of Maryland." Being aggrieved equally, the parties filed appeals timely, asking why an out-of-state, same-sex marriage, valid when and where performed, was not cognizable in Maryland for purposes of the application of its domestic divorce laws.

Putting aside for present purposes whatever may turn out to be the view of the Maryland electorate regarding recognition of the performance in Maryland of domestic same-sex marriages, the treatment given such relationships by the Maryland Legislature (until recently) may be characterized as a case of multiple personality disorder.[1] Exhibit One in this lay diagnosis is the currently effective version of § 2–201 of the Family Law Article of the Maryland Code, defining marriage, for purposes of such ceremonies conducted in Maryland, as being only between a man and a woman.[2] *See Conaway v.*

---

1. The essential feature of multiple personality disorder (also known as dissociative identity disorder) is the existence within a person of two or more distinct identities or personality states. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 484 (4th. ed.1994). There are at least two fully developed personalities, each having unique memories and behavior patterns. *Id.*

2. The General Assembly enacted, during the 2012 session, the Civil Marriage Protection Act ("CMPA"), H.B. 438, 2012 Leg., 429th Sess. (Md.2012). The Governor signed the bill into law on 1 March 2012. The law, when effective, will change § 2–201 [to become § 2–201(b) ] to

*Deane,* 401 Md. 219, 325, 932 A.2d 571, 635 (2007) (rejecting constitutional challenges to § 2–201). Exhibit Two is a long list of enactments protecting gay persons and same-sex couples from discrimination (by reason of their sexual orientation and relationships) in employment,[3] health care,[4] estate planning,[5] and other areas.[6]

These perceptually mixed legal messages bear directly on resolving the question presented in the present case because they are where we find most often the public policy of Maryland. In order for the parties' foreign same-sex marriage to be recognized in this State for purposes of the application of our domestic divorce laws, that marriage cannot be "repugnant" to Maryland public policy, as that term is understood under the common law doctrine of comity.

## I. FACTUAL AND PROCEDURAL HISTORY

The evidence is undisputed in the record of this case. Port and Cowan were wed in a civil ceremony in California on 10

---

read "only a marriage between two individuals who are not otherwise prohibited from marrying is valid in this State." The law provides a prospective effective date of 1 January 2013, or later if litigation is pending on 1 January 2013 arising from an anticipated petition referendum initiative to place the measure on the ballot before the Maryland electorate for the November 2012 general election. *See* 2012 Md. Laws 2, §§ 5, 7. Thus, if the petition initiative receives successfully the State Board of Elections' approval of the requisite number of signatures of eligible voters, but that approval spawns litigation that is not resolved finally by 1 January 2013, or the electorate rejects the law at the polls in November 2012 and litigation results from that action which is not resolved finally on or before 1 January 2013, the effective date of the CMPA (if it should become effective at all) may be later than 1 January 2013. At the time this opinion is filed, the petition initiative is ongoing. For reasons explained *infra,* whether the CMPA becomes effective is of no impact on the resolution of the present case. *See infra* note 11.

3. Md.Code Ann., State Gov't § 20–606 (LexisNexis 2009).

4. *See, e.g.,* Md.Code Ann., Health–Gen. § 6–101 (LexisNexis 2009).

5. Md.Code Ann., Tax–Prop. §§ 12–101(e–2), –108(c)(1)(ix), (d)(1)(ii), 13–207(a)(2)–(3) (LexisNexis Supp.2011).

6. *See infra* note 18 and accompanying text.

October 2008.[7] At that time, California recognized domestic same-sex marriage.[8] That the parties' marriage was formed validly in California is neither contested nor at issue on this record. Therefore, we assume, for purposes of this appeal, that the parties' marriage was, and is, valid in California.

Approximately eight months after marrying, the parties agreed to separate on or about 24 June 2009. After the requisite period of separation, Port filed in the Circuit Court for Prince George's County on 12 July 2010 a complaint for an absolute divorce. Cowan filed timely a "no contest" answer to Port's divorce complaint. The couple were not parents. There was no dispute identified or decision sought by the parties regarding marital property, alimony, or support submitted to the court.

The Circuit Court received testimony at a hearing on 15 October 2010 establishing and corroborating the divorce ground of mutual separation. In its 22 October 2010 dispositive order, the court concluded that Port met the residency requirements for divorce, had been separated voluntarily for

7. Presently, Connecticut, the District of Columbia, Iowa, Massachusetts, New Hampshire, New York, and Vermont solemnize same-sex marriages. D.C.Code § 46–401 (LexisNexis through 23 Dec. 2011); *Kerrigan v. Comm'r of Pub. Health*, 289 Conn. 135, 957 A.2d 407 (2008); *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009); *Goodridge v. Dep't of Pub. Health*, 440 Mass. 309, 798 N.E.2d 941 (2003); N.H.Rev.Stat. Ann. § 457:1 (LexisNexis through chapter 9 of 2012 session); N.Y. Dom. Rel. Law § 10–a (LexisNexis through 2012 released chapters 1–8, 10–24, 50–55); Vt. Stat. Ann. tit. 15, § 8 (LexisNexis through 2011 session). Several foreign countries solemnize same-sex marriage, including Canada. Civil Marriage Act S.C.2005, c. 33 (Can.).

8. Approximately one month after the parties' marriage, the voters of California adopted Proposition 8, which enacted a state constitutional provision limiting the definition of marriage to a man and a woman. *Strauss v. Horton*, 46 Cal.4th 364, 93 Cal.Rptr.3d 591, 207 P.3d 48, 59 (2009). Proposition 8, however, did not affect the validity of same-sex marriages formed in California during the time when it was legal to do so. *Strauss*, 93 Cal.Rptr.3d 591, 207 P.3d at 119. In any event, the federal Ninth Circuit Court of Appeals concluded subsequently that Proposition 8 violated the Fourteenth Amendment to the Constitution. *Perry v. Brown*, 671 F.3d 1052, 1063 (9th Cir.2012). The mandate is stayed presently, however, pending the outcome of an en banc rehearing. *See* Fed. R.App. P. 41; 9th Cir. R. 41–1, –2.

more than one year, and had no hope or expectation of reconciliation. *See, e.g., Wallace v. Wallace,* 290 Md. 265, 275, 429 A.2d 232, 238 (1981) (stating that the three elements of voluntary separation are "(i) an express or implied agreement to separate, accompanied by a mutual intent not to resume the marriage relationship; (ii) voluntarily living separate and apart without cohabitation for twelve months prior to the filing of the bill of complaint; and (iii) that the separation is beyond any reasonable hope of reconciliation"); *Fletcher v. Fletcher,* 95 Md.App. 114, 123, 619 A.2d 561, 565 (1993) (explaining that jurisdiction over a divorce requires at least one of the parties to the marriage be domiciled in the State). Despite these conclusions, the Circuit Court denied Port's divorce request. The trial judge reasoned solely that the "same sex marriage in which the parties hereto participated is not valid pursuant to Maryland law.... [T]o recognize the alleged marriage would be contrary to the public policy of Maryland."

Port filed timely an appeal to the Court of Special Appeals. Cowan filed timely a cross-appeal. Despite being opposing parties technically, Port and Cowan agree that their California marriage should be recognized in Maryland for purposes of the application of Maryland's divorce laws, and a divorce granted. Prior to the intermediate appellate court deciding the appeal, we issued, on our initiative, a writ of certiorari. *Port v. Cowen,* 422 Md. 353, 30 A.3d 193 (2011).

## II. QUESTION PRESENTED

Port and Cowan present in their respective appeals the same, single question for our consideration: "Must the Circuit Court grant a divorce to two people of the same sex who were validly married in another jurisdiction and who otherwise meet the criteria for divorce under Maryland law?" Because this question is purely a legal one, we review without deference the Circuit Court's conclusions. *See, e.g., Taylor v. Giant of Md., LLC,* 423 Md. 628, 651, 33 A.3d 445, 459 (2011) (citing *Rosemann v. Salsbury, Clements, Bekman, Marder & Adkins, LLC,* 412 Md. 308, 314, 987 A.2d 48, 52 (2010)).

The parties posit that an affirmative response by us to their question is compelled by proper application of the principles of the common law doctrine of comity. They argue alternatively that the Circuit Court's failure to recognize their marriage violated their equal protection and due process rights, contained within Article 24 of the Maryland Declaration of Rights. No one appeared before us, in writing or in person, to argue that we should affirm the Circuit Court's judgment.[9] Because we resolve this appeal on the non-constitutional ground of comity, we shall not reach the parties' equal protection and due process arguments. *Prof'l Staff Nurses Ass'n v. Dimensions Health Corp.*, 346 Md. 132, 138–39, 695 A.2d 158, 161 (1997) (quoting *State v. Lancaster*, 332 Md. 385, 404 n. 13, 631 A.2d 453, 463 n. 13 (1993)) (noting that the Court of Appeals will not reach a constitutional issue when a case may be decided on a non-constitutional ground).

## III. DISCUSSION

As we noted at the outset, § 2–201 of the Family Law Article provides (now and at the time the Circuit Court decided this case) that "[o]nly a marriage between a man and a woman is valid in this State." Md.Code Ann., Fam. Law § 2–201 (LexisNexis 2006). In 2007, we concluded that this prohibition on domestic same-sex marriage did not violate Articles 24 and 46 of the Maryland Declaration of Rights. *Conaway*, 401 Md. at 325, 932 A.2d at 635. Thus, Maryland will recognize a marriage solemnized within its boundaries if it is between a man and a woman only.[10]

---

**9.** No one moved to file an amicus brief arguing against Port's and Cowan's position. On the other hand, we received amicus briefs in support of the parties' position from the American Civil Liberties Union of Maryland, the Deans and Faculty of the University of Baltimore School of Law, the Deans and Faculty of the University of Maryland Francis King Carey School of Law, Equality Maryland, Inc., Maryland Black Family Alliance, the National Black Justice Coalition, and Rainbow Families.

**10.** Subject, of course, prospectively to whether the CMPA becomes effective. *See supra* note 2.

This appeal, however, does not require us to revisit *Conaway*, nor does the resolution of this case implicate the Civil Marriage Protection Act (CMPA), enacted by the General Assembly during its 2012 session. H.B. 438, 2012 Leg., 429th sess. (Md.2012). Instead, we are asked whether a valid out-of-state, same-sex marriage may be recognized in this State, for purposes of a domestic divorce action. Courts deciding whether a foreign marriage is valid in this State, for purposes of divorce or otherwise, employ the common law doctrine of comity, not principally our domestic marriage laws. *See, e.g., Henderson v. Henderson,* 199 Md. 449, 457–58, 87 A.2d 403, 408 (1952); *Fensterwald v. Burk,* 129 Md. 131, 137–38, 98 A. 358, 369 (1916).[11]

We note that there appears to be a conflict among the Circuit Courts of this State regarding the issue before us. In addition to the present case, the Circuit Court for Baltimore City denied recognition to an apparently valid foreign same-sex marriage for purposes of applying Maryland's divorce laws. The Baltimore City case is pending before the Court of Special Appeals. *Brown v. Keller,* No. 24–D10–001660DA (Cir.Ct.Balt.City, Md.2011), *appeal filed,* No. 816, September Term, 2011 (Md.Ct.Spec.App.2011). Conversely, the Circuit Courts for Anne Arundel and St. Mary's Counties granted

---

11. Like the legislation considered in *Conaway v. Deane,* 401 Md. 219, 932 A.2d 571 (2007), the CMPA governs domestic same-sex marriages, not whether valid foreign same-sex marriages should be recognized in Maryland. According to its terms, it will become effective on 1 January 2013 (or thereafter, if at all, based on the outcome of related litigation that may be undertaken), as explained in footnote 2, *supra.* The CMPA authorizes domestic same-sex marriage by amending Family Law Article § 2–201. Whether the ongoing referendum petition "drive" to place this law on the November 2012 election ballot succeeds, and if so, whether the electorate rejects the CMPA, however, has no bearing on our consideration and resolution of the present case. If the electorate rejects the CMPA, § 2–201 will remain in its present formulation. As we shall explain *infra,* such a petition initiative, should it occur and succeed, does not evince that the recognition of valid-where-performed same-sex marriages, for the purposes application of domestic divorce laws, are "repugnant" to the public policy of this State. The result of that initiative has no bearing on the application of the principles of comity to the question before us in the present case.

divorces to same-sex couples, married validly outside-of-the-State. *Migues v. Johnson,* No. 02–C–10–155341DA (Cir. Ct. Anne Arundel Cnty., Md.2011); *Cole v. Clover,* No. 18–C–10–000327 (Cir. Ct. St. Mary's Cnty., Md.2010). The divergent treatment of foreign same-sex marriages by these Circuit Courts demonstrates the need for this Court to resolve the conflict.

## A. The Doctrine of Comity

 Under the doctrine of comity, long applied in our State, Maryland courts "will give effect to laws and judicial decisions of another state or jurisdiction, not as a matter of obligation but out of deference and respect." *Wash. Suburban Sanitary Comm'n v. CAE–Link Corp.,* 330 Md. 115, 140, 622 A.2d 745, 757 (1993) (citing *Galloway v. Watts,* 395 F.Supp. 729, 731 (D.Md.1975)). When considering a foreign marriage specifically, Maryland courts follow the choice-of-law rule of *lex loci celebrationis,*[12] applying the substantive law of the place where the contract of marriage was formed. *Jackson v. Jackson,* 82 Md. 17, 28, 33 A. 317, 318 (1895).

██ Generally, Maryland courts will honor foreign marriages as long as the marriage was valid in the state where performed. *Henderson,* 199 Md. at 458, 87 A.2d at 408; *Bannister v. Bannister,* 181 Md. 177, 180, 29 A.2d 287, 288 (1942); *accord* Restatement (Second) of Conflict of Laws § 283(1) (1971). There are two exceptions to this rule: the foreign marriage may not be "repugnant" to Maryland public policy and may not be prohibited expressly by the General Assembly. *See Henderson,* 199 Md. at 459, 87 A.2d at 409 ("[T]he State is not bound to give effect to marriage laws that

---

**12.** Although we use the Latin phrase *lex loci celebrationis,* which means the law of the place of the ceremony, Maryland common law uses actually the alternative phrase *lex loci contractus,* meaning the law of the place where a contract is executed (marriage is, after all, a contract). If Latin is to be used at all, it is more correct in the present context to use *celebrationis.* Black's Law Dictionary 995 (9th ed. 1990) ("[*Lex loci celebrationis* usually] governs when the validity of a marriage is at issue."); *see also* William M. Richman & William L. Reynolds, *Understanding Conflict of Law* § 116(a), at 362 (2d ed.1993).

are repugnant to its own laws and policy. Marriages that are tolerated in another state but are condemned by the State of Maryland as contrary to its public policy will not be held valid in this State."); *Fensterwald,* 129 Md. at 137–38, 98 A. at 360 (quoting *Jackson,* 82 Md. at 29–30, 33 A. at 318–19); *accord* Restatement (Second) of Conflict of Laws § 283(2).

Maryland recognizes liberally foreign marriages, even those marriages that may be prohibited from being formed if conducted in this State. Research by the parties, amici, and this Court failed to reveal a case, decided by this Court, voiding a valid out-of-state marriage that was prohibited from being formed in Maryland.[13] Liberal recognition of out-of-state marriages promotes "uniformity in the recognition of the marital status, so that persons legally married according to the laws of one state will not be held to be living in adultery in another State, and that children begotten in lawful wedlock in one State will not be held illegitimate in another." *Henderson,* 199 Md. at 458, 87 A.2d at 408 (citing, among other authorities, *Lando v. Lando,* 112 Minn. 257, 127 N.W. 1125 (1910)). Further, the recognition of foreign marriages instills stability in "one of the most important of human relations." Eugene F. Scoles & Peter H. Hay, *Conflict of Laws* 429 (2d ed.1991); *see also* William M. Richman & William L. Reynolds, *Understanding Conflict of Laws* § 116(a), at 362 (2d ed.1993).

The following cases illustrate the liberal recognition of valid foreign marriages in this State. Maryland law prohibits the formation of common law marriages within the State. *Mendelson v. Mendelson,* 75 Md.App. 486, 502, 541 A.2d 1331,

---

**13.** This Court has denied, however, recognition to a foreign divorce. *Aleem v. Aleem,* 404 Md. 404, 947 A.2d 489 (2008). The wife filed in Maryland for a limited divorce from her husband. *Aleem,* 404 Md. at 406, 947 A.2d at 490. The husband argued that his *talaq* divorce, obtained in and recognized by Pakistan, deprived Maryland courts of jurisdiction to hear the wife's marital property claims. *Id.* We declined to extend comity to the *talaq* divorce because it was contrary to Maryland public policy regarding equitable distribution of marital property, in the absence of a valid agreement to the contrary. *Aleem,* 404 Md. at 425, 947 A.2d at 502.

1339 (1988). Yet, Maryland courts will recognize out-of-state common law marriages, if valid where formed. *See, e.g., Henderson,* 199 Md. at 458–60, 87 A.2d at 408–09 (recognizing, for purposes of divorce, a common law marriage formed in the District of Columbia); *Whitehurst v. Whitehurst,* 156 Md. 610, 620, 145 A. 204, 207–08 (1929) (recognizing, for purposes of administering the deceased husband's estate, a common law marriage formed in New York). The Court of Special Appeals has gone so far as to infer that a couple's two-day sojourn in Pennsylvania, a common law marriage state, created a valid foreign marriage, where their relationship fulfilled otherwise the common law marriage requirements. *Blaw–Knox Constr. Equip. Co. v. Morris,* 88 Md.App. 655, 669–72, 596 A.2d 679, 685–87 (1991) (concluding that, for purposes of maintaining a wrongful death claim, there was sufficient evidence for the jury to consider whether a couple was married).

We recognized, for domestic law purposes, a Rhode Island marriage between an uncle and a niece. *Fensterwald,* 129 Md. at 137–38, 98 A. at 360. At that time in Maryland, an uncle-niece marriage was void and constituted further a misdemeanor, subject to a fine. Md.Code (1904), Art. 27 § 297, Art. 62 § 2. The couple traveled to Rhode Island expressly for the purpose of avoiding the Maryland prohibition (and possibly criminal prosecution). *Fensterwald,* 129 Md. at 134, 98 A. at 359. Despite these facts, we deemed the marriage so formed in Rhode Island to be valid in this State.

B. Applying *Lex Loci Celebrationis* to the Parties'
Valid Foreign Same–Sex Marriage

■ *Henderson, Fensterwald,* and the other cases considered above demonstrate that Maryland courts will recognize liberally valid foreign marriages. *See also Frey v. Frey,* 298 Md. 552, 560, 471 A.2d 705, 709 (1984) ("[N]o state interest exists in preserving a marriage in which the relationship has broken down irretrievably."). The parties' California same-sex marriage is valid. Therefore, in order for their marriage to be valid for purposes of whether Maryland will adjudicate its dissolution, it must not run afoul of either exception to lex loci

celebrationis: that is, it cannot be prohibited by statute or "repugnant" to the public policies of Maryland. For the following reasons, Port's and Cowan's entitlement, on this record, to a Maryland divorce from their California same-sex marriage is not prohibited, as a matter of law and on this record, by these exceptions.[14]

■ Regarding the statutory prohibition exception, Family Law Article § 2–201 does not forbid expressly valid-where-formed foreign same-sex marriages. The plain wording of § 2–201 provides that "[o]nly a marriage between a man and a woman is valid in this State." It does not preclude from recognition same-sex marriages solemnized validly in another jurisdiction, only those sought-to-be, or actually, performed in Maryland. To preclude the former from being valid, the statute in question must express a clear mandate voiding such marriages and abrogating the common law. *Molesworth v. Brandon,* 341 Md. 621, 630, 672 A.2d 608, 613 (1996) (" '[A]b-sent a statute expressing a clear mandate of public policy, there ordinarily is no violation of [it].' " (quoting *Watson v. People's Ins. Co.,* 322 Md. 467, 478, 588 A.2d 760, 765 (1991))); *Azarian v. Witte,* 140 Md.App. 70, 95, 779 A.2d 1043, 1057 (2001) (citing *Robinson v. State,* 353 Md. 683, 693, 728 A.2d 698, 702–03 (1999)). Moreover, we note that same-sex marriages are not listed in Family Law Article § 2–202 as among those marriages considered void.

Other states intending to prevent recognition of valid foreign same-sex marriages have done so expressly and clearly, rather than by implication, subtlety, or indirection. For example, the Pennsylvania Code provides, "A marriage between persons of the same sex which was entered into in another

---

**14.** In addition to the briefs of the parties and amici curiae, we are guided by the Maryland Attorney General's opinion, which concluded that foreign same-sex marriages are valid in Maryland. *See* Marriage—Whether Out–of–State Same–Sex Marriage That is Valid in the State of Celebration May Be Recognized in Maryland, 95 Op. Att'y Gen. Md. 3 (2010). Although certainly not binding on this Court, we consider for its persuasive value, if any, the Attorney General's opinion. *See, e.g., Dodds v. Shamer,* 339 Md. 540, 556–57, 663 A.2d 1318, 1326 (1995).

state or foreign jurisdiction, even if valid where entered into, shall be void in this Commonwealth." 23 Pa. Cons.Stat. § 1704 (LexisNexis through 2011). The Virginia Code provides, "Any marriage entered into by persons of the same sex in another state or jurisdiction shall be void in all respects in Virginia and any contractual rights created by such marriage shall be void and unenforceable." Va.Code Ann. § 20–45.2 (LexisNexis through 2011). The Missouri Statute provides, "A marriage between persons of the same sex will not be recognized for any purpose in this state even when valid where contracted." Mo.Rev.Stat. § 451.022(4) (LexisNexis through 96th General Assembly).[15] The language of § 2–201, by comparison, fails to void for present purposes valid foreign same-sex marriages.

On at least eight occasions, the Maryland General Assembly failed to amend § 2–201 to preclude valid out-of-state same-sex marriages from being recognized in Maryland. For example, during the 2010 legislative session, House Bill 90 (cross-filed with Senate Bill 852) sought to add the following language to § 2–201: "A marriage between two individuals of the same sex that is validly entered into in another state or foreign country is not valid in this State." H.B. 90, 2010 Leg., 427th Sess. (Md.2010) (died in a House committee). Similar amendments have failed to become law on at least seven other occasions, by our count. *See* H.B. 693, 2005 Leg., 420th Sess. (Md.2005) (died in a House committee); H.B. 728, 2004 Leg., 418th Sess. (Md.2004) (died in a House committee); H.B. 531, 2001 Leg., 415th Sess. (Md.2001) (died in a House committee); H.B. 1128, 1999 Leg., 413th Sess. (Md.1999) (died in a House committee); S.B. 565, 1998 Leg., 412th Sess. (Md.1998) (passed on third reading in the Senate, but died in a House committee with an unfavorable report); H.B. 398, 1997 Leg.,

---

**15.** For additional examples, *see* Ala.Code § 30–1–19(e) (LexisNexis through 2012 regular session) ("The State of Alabama shall not recognize as valid any marriage of parties of the same sex that occurred or was alleged to have occurred as a result of the law of any jurisdiction regardless of whether a marriage license was issued."); W. Va.Code Ann. § 48–2–603 (LexisNexis through 4th 2011 extraordinary session) (stating that foreign same-sex marriages "shall not be given effect").

411th Sess. (Md.1997) (died in a House committee); H.B. 1268, 1996 Leg., 410th Sess. (Md.1996) (died in a House committee). This pattern permits an inference, which we take, that the General Assembly intended the doctrine of comity regarding foreign same-sex marriages to remain the proper analysis to employ here. *See Potomac Valley Orthopaedic Assocs. v. Md. State Bd. of Physicians,* 417 Md. 622, 639–41, 12 A.3d 84, 94–95 (2011) (citations omitted).

▋ We conclude also that the parties' same-sex marriage is not "repugnant" to Maryland "public policy," as that term is understood properly in applying the doctrine of comity in modern times. Admittedly, "public policy" is an amorphous legal concept.[16] It is agreed, however, that wherever found and identified, that public policy prohibits generally conduct that injures or tends to injure the public good. *Md.–Nat'l Capital Park & Planning Comm'n v. Wash. Nat'l Arena,* 282 Md. 588, 605–06, 386 A.2d 1216, 1228 (1978) (quoting *Egerton v. Brownlow,* 4 H.L. Cas. 1, 196 (1853)). The primary sources of public policy (and where typically we look to divine it) are the State's constitution, statutes, administrative regulations, and reported judicial opinions. *Adler v. Am. Standard Corp.,* 291 Md. 31, 45, 432 A.2d 464, 472 (1981) (quoting *Md.–Nat'l Capital Park & Planning Comm'n,* 282 Md. at 605–06, 386 A.2d at 1228). Although courts are not confined to these emanations of public policy in their search, secondary sources

---

**16.** In *Maryland–National Capital Park & Planning Commission v. Washington National Arena,* Judge Levine wrote that "jurists to this day have been unable to fashion a truly workable definition of public policy." 282 Md. 588, 605, 386 A.2d 1216, 1228 (1978). He noted further that "conceptions of public policy tend to ebb and flow with the tides of public opinion, making it difficult for courts to apply the principle with any degree of certainty." *Md.–Nat'l Capital Park & Planning Comm'n,* 282 Md. at 606, 386 A.2d at 1228 (citing 1 W. Story, *A Treatise on the Law of Contracts* § 675 (5th ed. 1874)). For example, in 1895, this Court grounded its notion of public policy on "Christendom," deeming foreign marriages "contrary to the law of nature as generally recognized in Christian countries" to be invalid in this State. *Jackson v. Jackson,* 82 Md. 17, 29–30, 33 A. 317, 318–19 (1895). Although the ecclesiastical underpinning of *Jackson* may not be without some continuing efficacy, the modern conception of public policy is not so limited and includes an objective, secular component.

are perceived generally as less persuasive. *See Adler,* 291 Md. at 45, 432 A.2d at 472.

The bar in meeting the "repugnancy" standard is set intentionally very high, as demonstrated in *Fensterwald* and *Henderson.* In the former case, this Court recognized an uncle-niece marriage solemnized in Rhode Island, despite the fact that it would be void and a misdemeanor had it been attempted to be formed in Maryland. *Fensterwald,* 129 Md. at 139, 98 A. at 360. In the latter case, we ruminated, in dictum, that a valid interracial marriage solemnized in another jurisdiction would be deemed invalid in Maryland.[17] The dictum in *Henderson* has been discredited, *Conaway,* 401 Md. at 304 n. 66, 932 A.2d at 622 n. 66, and the anti-miscegenation statute repealed, 1967 Md. Laws 6. For present purposes, however, the dictum demonstrates how elevated a standard "repugnancy" is. At the time of *Henderson,* interracial marriage was condemned by statute ("an infamous crime") and carried a severe penalty—imprisonment for not less than eighteen months and not more than ten years. Md.Code (1935), Art. 27 § 365, *repealed by* 1967 Md. Laws 6. By comparison, a same-sex marriage performed in Maryland does not carry for the couple (or the celebrant) a serious criminal penalty. *See, e.g.,* Md.Code Ann., Fam. Law § 2–406(d)(2) (LexisNexis 2006) (providing that an individual who marries knowingly two people prohibited by Family Law Article § 2–202 is guilty of a misdemeanor, punishable by a fine). Thus, based on the *Fensterwald–Henderson* line of cases, we cannot

---

17. Despite *Henderson* and the above referenced dictum, the Board of Immigration Appeals concluded subsequently that Maryland would recognize an interracial marriage, solemnized validly in another state, despite being against the law and a criminal violation in Maryland at the time. *In re C,* 7 I. & N. Dec. 108, 110–11 (B.I.A.1956). In that case, a Filipino man married a Caucasian woman in the District of Columbia to avoid purposefully Maryland's anti-miscegenation statute. *In re C,* 7 I. & N. Dec. at 109. The board noted that the Maryland statute did not "in express terms make void the marriage of persons domiciled in Maryland who attempt to evade this statutory provision by marriage in another state." *In re C,* 7 I. & N. Dec. at 110–11.

conclude logically that valid out-of-state same-sex marriages are "repugnant" to Maryland public policy.

With regard to the second exception to *lex loci celebrationis*, recognizing valid foreign same-sex marriages is consistent actually with Maryland public policy. Prior to the Attorney General's opinion surmising that this Court would recognize foreign same-sex marriages (valid where entered), the General Assembly enacted several laws that protect and support same-sex couples, as alluded to earlier in this opinion. An array of statutes prohibit public or private discrimination based on sexual orientation in the areas of employment, public accommodations, leasing commercial property, and housing. Md. Code Ann., State Gov't §§ 20–304, 401, 501, 606, 705, 901 (LexisNexis 2009); *see also* Md.Code Regs. 01.01.2007.16(A)(13) (2007) (gubernatorial executive order protecting State executive branch employees and applicants from sexual-orientation discrimination). Maryland's domestic partner statute extends to same-sex couples, who qualify as domestic partners, certain medical and decision-making rights as regards one another.[18] Md.Code Ann., Health–Gen. § 6–101 (LexisNexis 2009); *see also* Madeleine N. Foltz, Comment, *Needlessly Fighting an Uphill Battle: Extensive Estate Planning Complications Faced by Gay and Lesbian Individuals*, 40 U. Balt. L.Rev. 495, 523–24 (2011). The General Assembly granted also recordation, transfer, and inheritance tax exemptions to same-sex couples who qualify as domestic partners. Md.Code Ann., Tax–Prop. §§ 12–101(e–2), –108(c)(1)(ix),

---

**18.** The Health–General Article (LexisNexis 2009) extends to qualifying domestic partners the following rights: visiting a domestic partner in a health facility or nursing home (§ 6–201 & § 19–344(k)(2)); sharing a nursing-facility room (§ 19–344(h)); accompanying a domestic partner in a medical-emergency transport (§ 6–202); surrogate decision-making authority when the other partner is incapacitated and has not granted power of authority to another (§ 5–605(a)(2)(ii)); authority to consent to a postmortem examination of a deceased partner (§ 5–501(b)(iii)); authority over the disposition of a deceased partner's remains (§ 5–509(c)(1)); and, access to burial permits related to a deceased partner (§ 4–215(e)(5)(iii)). Further, a surviving domestic partner is a "person of interest" as regards the deceased partner's burial site. Md.Code Ann., Real Prop. § 14–121(a)(4)(iii).

(d)(1)(ii), 13–207(a)(2)–(3) (LexisNexis Supp.2011); Md.Code Ann. Tax–Gen. § 7–203(*l* ) (LexisNexis 2010). Finally, this Court rejected discrimination based on sexual orientation in the context of certain family law situations. In *Boswell v. Boswell*, we concluded that sexual orientation of a parent ordinarily is irrelevant in a visitation dispute (unless the court finds that the child would be impacted adversely in a demonstrable way because of the parent's conduct with his/her partner in front of the child). 352 Md. 204, 237–38, 721 A.2d 662, 678 (1998); *see also North v. North*, 102 Md.App. 1, 16–17, 648 A.2d 1025, 1032–33 (1994) (concluding that the trial court abused its discretion by denying overnight visitation to a father based on his sexual orientation).[19]

After the Attorney General published his opinion in 2010, the State of Maryland expressed a panoply of policies recognizing explicitly out-of-state same-sex marriages. *See* Marriage—Whether Out–of–State Same–Sex Marriage That is Valid in the State of Celebration May Be Recognized in Maryland, 95 Op. Att'y Gen. Md. 3 (2010); Press Release, Statement from Governor O'Malley on Attorney General's Same Sex Marriage Recognition Opinion (24 Feb. 2010) ("I expect all State agencies to work with the Attorney General's office to ensure" recognition of out-of-state same-sex marriages). The Department of Budget and Management changed its paid-leave and employee-benefit policies to include same-sex spouses of eligible State employees. *See Same Sex Domestic Partner and Same Sex Spouse FAQ's*, Md. Dept. of Budget and Mgmt., http://dbm.maryland.gov/benefits/ Documents/SameSexDPSpouseFAQs.pdf (lasted visited 16 May 2012); *Important Benefit Update Concerning Same–Sex Spouses*, Md. Dept. of Budget and Mgmt., http://www.dbm. maryland.gov/benefits/Pages/BenefitUpdateConcerningSame. aspx (last visited 16 May 2012). The Board of Regents of the

---

19. Although the issue has not been addressed in a holding by the Court, Judge Raker, in her concurring/dissenting opinion in *Conaway*, expressed her view that Family Law Article § 5–3A–29 permits same-sex couples to adopt children. *Conaway*, 401 Md. at 334–36, 932 A.2d at 641–42 (2007) (Raker, J., concurring/dissenting).

University System of Maryland, for purposes of tuition remission and other policies, redefined spouse to be "consistent with the advice given by the Office of the Attorney General." Clarification of the Definition of "Spouse" in BOR Policies, University System of Maryland Board of Regents (12 Sept. 2010), *available at* http://www.usmd.edu/BORPortal/Materials/2010/FB/20100917/6f.pdf. Finally, the Department of Health and Mental Hygiene changed its procedure so that a female same-sex spouse (who did not give birth) can be listed as a parent without having to obtain a court order. Letter from Geneva G. Sparks, State Registrar and Deputy Director, to Birth Registrar (10 February 2011), *available at* http://data.lambdalegal.org/in-court/downloads/exec_md_20110210_ss-spouse-instructions-to-facilities.pdf.

A number of other states with similar comity principles and relevant domestic marriage laws to those of Maryland have recognized foreign same-sex marriages for purposes of their domestic divorce laws. In *Christiansen v. Christiansen,* a same-sex couple, whose marriage was formed validly in Canada, appealed the denial of their divorce request by the courts of Wyoming. 253 P.3d 153, 154 (Wyo.2011). Wyoming has a statute limiting marriage to a man and woman, but fails to proscribe by legislation recognition of valid foreign same-sex marriages. *See* Wyo. Stat. Ann. § 20–1–101 (LexisNexis through 2011 regular session). It also recognizes foreign marriages pursuant to *lex loci celebrationis* (although the principle is codified, rather than a creature of the common law) and will not validate a foreign marriage "contrary to the policy of [Wyoming] laws." *Christiansen,* 253 P.3d at 155–56 (citing Wyo. Stat. Ann. § 20–1–111 (LexisNexis through 2011 regular session)). The court, noting that the "policy exception is necessarily narrow, lest it swallow the rule," concluded that recognizing a valid foreign same-sex marriage for purposes of a domestic divorce proceeding "does not lessen the law or policy in Wyoming against allowing the creation of same-sex marriages [in Wyoming]." *Christiansen,* 253 P.3d at 156. New York, which prior to enacting a marriage-equality law in 2011 had comity and marriage laws similar to Maryland and

Wyoming, recognized foreign same-sex civil unions for purposes of divorce. *See Dickerson v. Thompson,* 73 A.D.3d 52, 897 N.Y.S.2d 298, 299–301 (2010) (no subsequent appeal). See also New Mexico Opinion Attorney General 11–01 (2011), *available at* 2011 WL 111234, concluding that "same-sex marriage that is valid under the laws of the country or state where it was consummated would likewise be found valid in New Mexico."

Some states have elected not to recognize valid foreign same-sex marriages for purposes of domestic divorce proceedings. *See, e.g., In re J.B.,* 326 S.W.3d 654 (Tex.Ct.App.2010); *Kern v. Taney,* 11 Pa. D. & C. 5th 558 (Pa.C.P.Ct.2010). Those states, unlike Maryland, expressed clear public policies against honoring foreign same-sex marriages. *In re J.B.,* 326 S.W.3d at 665 ("Section 6.204(b) [of the Texas Family Code] declares same-sex marriages void and against Texas public policy."); *Kern,* 11 Pa. D. & C. 5th at 562 ("'A marriage between persons of the same sex which was entered into in another state or foreign jurisdiction, even if valid where entered into, shall be void in this Commonwealth.'" (quoting 23 Pa. Cons.Stat. § 1704)).[20]

---

**20.** The Supreme Court of Rhode Island opted also not to honor foreign same-sex marriages for purposes of domestic divorces. *Chambers v. Ormiston,* 935 A.2d 956 (R.I.2007). Although that state does not have a clear public policy against recognizing such marriages, *Chambers* is distinguishable from *In re J.B., Kern,* and the present case. The issue in *Chambers* was whether the Rhode Island family court, a legislatively created court of limited jurisdiction and authority, had jurisdiction, under the prevailing statute, over parties seeking to annul their valid foreign same-sex marriage. 935 A.2d at 962–63. The statute provides that the Rhode Island family court could "hear and determine all petitions from the bond of marriage." R.I. Gen. Laws § 8–10–3 (Lexis-Nexis through January 2011 session). The *Chambers* court resolved that the word "marriage" in the statute connoted opposite-sex marriage only. *Chambers,* 935 A.2d at 962–63.

Maryland Circuit Courts, by comparison, are courts of general jurisdiction with common law and equitable powers. Md.Code Ann., Cts. & Jud. Proc. § 1–501 (LexisNexis 2006). The Family Law Article grants jurisdiction to equity courts, i.e., the Circuit Courts, over "divorce," without using the term "marriage." Md.Code Ann., Fam. Law § 1–201(a)(4) (LexisNexis 2006).

## IV. CONCLUSION

 Under the principles of the doctrine of comity applied in our State, Maryland courts will withhold recognition of a valid foreign marriage only if that marriage is "repugnant" to State public policy. This threshold, a high bar, has not been met yet; e.g., no still viable decision by this Court has deemed a valid foreign marriage to be "repugnant," despite being void or punishable as a misdemeanor or more serious crime were it performed in Maryland. The present case will be treated no differently. A valid out-of-state same-sex marriage should be treated by Maryland courts as worthy of divorce, according to the applicable statutes, reported cases, and court rules of this State.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTION TO GRANT A FINAL DIVORCE TO THE PARTIES. PARTIES TO BEAR EQUALLY THE COSTS IN THIS COURT.**